Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

# UNITED STATES DISTRICT COURT
### for the
MIDDLE District of FLORIDA

JACKSONVILLE Division

PROVIDED TO PUTNAM CORRECTIONAL ON 3-11-22 FOR MAILING BY

Case No. 3:22-cv-215-BJD-JBT

*(to be filled in by the Clerk's Office)*

STEVEN WINCH

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

–v–

CENTURION OF FLORIDA, LLC et. al.

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names. Do not include addresses here.)*

FILED

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
(Prisoner Complaint)

---

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

---

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## I.   The Parties to This Complaint

### A.   The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

Name                         _Steven Winch_
All other names by which
you have been known:         _Steve Winch_
ID Number                    _L21077_
Current Institution          _Putnam Correctional Institution_
Address                      _128 Yelvington Road_
                             _East Palatka,____FL____32131_
                                   City         State      Zip Code

### B.   The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  For an individual defendant, include the person's job or title *(if known)* and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1
    Name                     _Centurion of Florida, LLC_
    Job or Title *(if known)* _Contracted by FDC to provide health care services to prisoners_
    Shield Number
    Employer
    Address                  _2724 NE 14th Street_
                             _Ocala____FL____34470_
                                   City         State      Zip Code
                             ☐ Individual capacity   ☑ Official capacity

Defendant No. 2
    Name                     _Jackie Westfall_
    Job or Title *(if known)* _Medical Director / Licensed Physician_
    Shield Number
    Employer                 _Centurion of Florida, LLC_
    Address                  _2724 NE 14th Street_
                             _Ocala____FL____34470_
                                   City         State      Zip Code
                             ☑ Individual capacity   ☐ Official capacity

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

**Defendant No. 3**

Name — Max Solano

Job or Title *(if known)* — Medical Doctor – Dermatologist

Shield Number — Former contractor for Centurion of Fla, LLC

Employer —

Address — 2627 Riverside Avenue

Ocala       FL       34470
       *City*      *State*      *Zip Code*

☑ Individual capacity       ☐ Official capacity

**Defendant No. 4**

Name — Loretta Dawson

Job or Title *(if known)* — Advanced Registered Nurse Practitioner

Shield Number —

Employer — Centurion of Fla, LLC

Address —

Ocala       FL       34470
       *City*      *State*      *Zip Code*

☑ Individual capacity       ☐ Official capacity

See Attached page 12
for additional Defendants

## II.   Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.   Are you bringing suit against *(check all that apply)*:

☐ Federal officials (a *Bivens* claim)

☑ State or local officials (a § 1983 claim)

B.   Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

Eight Amendment of the U.S. Constitution.

C.   Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

D.  Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

Defendant's Centurion, Solano, Westfall, Jane Doe #1, Jane Doe #2, and Gupta acted under color of state law when they deprived Plaintiff of adequate medical care for a serious medical condition.

## III.  Prisoner Status

Indicate whether you are a prisoner or other confined person as follows *(check all that apply)*:

☐  Pretrial detainee

☐  Civilly committed detainee

☐  Immigration detainee

☑  Convicted and sentenced state prisoner

☐  Convicted and sentenced federal prisoner

☐  Other *(explain)*  _____

## IV.  Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.  If the events giving rise to your claim arose outside an institution, describe where and when they arose.

N/A

B.  If the events giving rise to your claim arose in an institution, describe where and when they arose.

Putnam Correctional Institution; Reception and Medical Center

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

C.   What date and approximate time did the events giving rise to your claim(s) occur?

October 2018 ; December 4, 2020 to present

D.   What are the facts underlying your claim(s)?  *(For example:  What happened to you?  Who did what? Was anyone else involved?  Who else saw what happened?)*

See Attachment pages 13-45

## V.   Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

See Attachment pages 46-47

## VI.   Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

See Attachment pages 47-48

**VII. Exhaustion of Administrative Remedies Administrative Procedures**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures. Your case may be dismissed if you have not exhausted your administrative remedies.

A. Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

☑ Yes

☐ No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

Taylor Correctional Institution when Centurion denied access to specialist.
Putnam Correctional Institution; Reception and Medical Center

B. Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☑ Yes

☐ No

☐ Do not know

C. Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claims?

☑ Yes

☐ No

☐ Do not know

If yes, which claim(s)?

Paragraphs 125-129; 131; 133-134; 136-137; 141-143

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

D.    Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

☑ Yes

☐ No

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

☐ Yes

☐ No

E.    If you did file a grievance:

1.    Where did you file the grievance?

See Attachment page 48

2.    What did you claim in your grievance?

See Attachment pages 49

3.    What was the result, if any?

See Attachment pages 49-50

4.    What steps, if any, did you take to appeal that decision? Is the grievance process completed? If not, explain why not. *(Describe all efforts to appeal to the highest level of the grievance process.)*

All grievances that were denied at the institutional level were appealed to the Bureau of Grievance Appeals. Approved Grievances no further action was taken. For Grievances appealed and returned with no action, these appeals were erroneously construed to be based on the same set of facts as a separate grievance regarding completely different facts. Two grievances are still pending a response but history shows these grievances will be denied as well. Plaintiff is being denied care to prevent substantial irreparable harm and felt he could wait no longer to initate this litigation.

F.    If you did not file a grievance:

　　　1.   If there are any reasons why you did not file a grievance, state them here:

_____ N/A _____

　　　2.   If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, and their response, if any:

_____ N/A _____

G.    Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.

_____ N/A _____

*(Note:   You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.)*

## VIII.  Previous Lawsuits

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court without paying the filing fee if that prisoner has "on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this "three strikes rule"?

☐ Yes

☑ No

If yes, state which court dismissed your case, when this occurred, and attach a copy of the order if possible.

_____

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

A.   Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

☐ Yes

☑ No

B.   If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.   Parties to the previous lawsuit

Plaintiff(s) _____

Defendant(s) _____

2.   Court *(if federal court, name the district; if state court, name the county and State)*

_____

3.   Docket or index number

_____

4.   Name of Judge assigned to your case

_____

5.   Approximate date of filing lawsuit

_____

6.   Is the case still pending?

☐ Yes

☐ No

If no, give the approximate date of disposition. _____

7.   What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

_____

C.   Have you filed other lawsuits in state or federal court otherwise relating to the conditions of your imprisonment?

Page 9 of 11

☐ Yes

☑ No

D.   If your answer to C is yes, describe each lawsuit by answering questions 1 through 7 below.  *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.   Parties to the previous lawsuit
     Plaintiff(s)   _____
     Defendant(s)   _____

2.   Court *(if federal court, name the district; if state court, name the county and State)*

     _____

3.   Docket or index number

     _____

4.   Name of Judge assigned to your case

     _____

5.   Approximate date of filing lawsuit

     _____

6.   Is the case still pending?

     ☐ Yes

     ☐ No

     If no, give the approximate date of disposition   _____

7.   What was the result of the case? *(For example: Was the case dismissed?  Was judgment entered in your favor?  Was the case appealed?)*

     _____

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## IX.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    *March 11, 2022*

Signature of Plaintiff    *Steve Winch*

Printed Name of Plaintiff    *Steven Winch*

Prison Identification #    *L21077*

Prison Address    *Putnam Correctional Institution, 128 Yelvington Road*

*East Palatka*                 *FL*          *32131*
City                              State          Zip Code

### B.    For Attorneys

Date of signing:    _____

Signature of Attorney    _____
Printed Name of Attorney    _____
Bar Number    _____
Name of Law Firm    _____
Address    _____

                    City               State          Zip Code

Telephone Number    _____
E-mail Address    _____

Defendant No. 5
    Name: Jane Doe #1
    Job or Title: Registered Nurse
    Employer: Centurion of Florida, LLC
    Address: 2724 NE 14th Street, Ocala, FL 34470
        ☑ Individual Capacity    Official Capacity

Defendant No. 6
    Name: Jane Doe #2
    Job or Title: Registered Nurse
    Employer: Centurion of Florida, LLC
    Address: 2724 NE 14th Street, Ocala, FL 34470
        ☑ Individual Capacity    Official Capacity

Defendant No. 7
    Name: Anand A. Gupta
    Job or Title: Medical Doctor/Surgeon
    Employer: Contracted by Centurion of Florida, LLC
    Address: 2724 NE 14th Street, Ocala, FL 34470
        ☑ Individual Capacity    Official Capacity

## IV.                    STATEMENT OF CLAIM

D.

1) Plaintiff has an ongoing serious medical condition mandating medical treatment to prevent substantial and irreparable harm.

2) Approximately, in the month of April of 2017, Plaintiff began suffering from skin irritation, rash-like bumps, itching, and sores.

3) On or about May 1, 2017, Plaintiff sought medical attention for these symptoms and was diagnosed with scabies. Permetherin Lotion and Ivermectin was prescribed. In just a few weeks after completing the medications for treatment as prescribed, it became apparent to Plaintiff that the treatment failed to resolve his skin disease.

4) Since contracting the disease, Plaintiff continuously sought medical care due to complaints of intense itching, rash-like bumps, excoriated lesions, and painful skin infections, etc. which continued to progress and increase in intensity.

5) Throughout the history of his skin disease, numerous care providers employed by Centurion of Florida, LLC repeatedly diagnosed him with scabies, prescribed Permetherin Lotion and/or Ivermectin, antibiotics, and Prednisone. Topical steroid creams and ointments were also repeatedly and overzealously prescribed. All those types of medications always proved ineffective in

13

bringing Plaintiff relief from the symptoms of his disease and failed to prevent substantial and irreparable harm.

6) Over the years to the present, Plaintiff has provided seven (7) skin samples in total for biopsy; results all returned no evidence of scabies mites and/or larva.

7) After nearly five (5) years, Plaintiff's chronic and unstable serious skin disease is still inaccurately diagnosed and inadequately medicated.

8) Defendant Centurion employs a Utilization Management team that reviews all requests for specialty consults and approves or denies them based on necessity and cost.

9) Defendant Centurion maintains policies, customs, directives, or practices pursuant to which inmates with serious medical needs are routinely denied adequate medical care.

10) Defendant Centurion prioritizes profits over care of inmates, fails to ensure a continuity of care for its patients, fails to ensure adequate staffing, refuses to provide proper treatment for difficult patients, and refuses to send patients to outside facilities.

11) Defendant Centurion's policies, customs, directives, or practices encourage their employees to ignore obvious symptoms of serious medical conditions and to provide only cursory medical care for the lesser, non-life threatening medical conditions.

14

12) Defendant Centurion's policies, customs, directives, or practices are used to contain the rising costs of inmate health care and to keep from exceeding FDC negotiated contract limits in order to maximize their profits.

13) Defendant Centurion's policies, customs, directives, or practices are the direct cause of Plaintiff's continued suffering and resulted in substantial and irreparable bodily harm.

14) Defendant Centurion's responsibilities include: supplying the staff who provide treatment/care at all of FDC facilities, coordinates the care of inmates who must receive specialist or hospital services outside the facility, and manages the overall system of care through a system of regional administration, quality assurance, and utilization management.

15) At the relevant times, Defendant's Centurion, Solano, Westfall, Dawson, Jane Doe #1, Jane Doe #2 and Gupta's actions were undertaken intentionally, with malice, and/or with reckless indifference to Plaintiff's rights.

16) Defendant's Centurion, Solano, Westfall, Dawson, Jane Doe #1, Jane Doe #2 and Gupta acted under color of state law at all times relevant to this Complaint.

### *Denial of Access to a Specialist*

17) Approximately, August or September of 2018, because the all the medications and treatments prescribed had failed to resolve his chronic and unstable

15

serious skin disease it was determined by a care provider employed by Defendant Centurion that Plaintiff required medical care not available at the institution where he was being housed. A Consultation Request was submitted to Defendant Centurion Utilization Management to gain approval for Plaintiff's referral to a specialist.

18) On October 15, 2018, Plaintiff learned that the Consultation Request was disapproved by Defendant Centurion Utilization Management. No medical explanation for the denial was provided to Plaintiff.

19) After the denial of the Consultation Request, between October 15, 2018, thru October 14, 2019, Plaintiff's skin disease continued in its progression and he continued to suffer intense itching, rash-like bumps, excoriated lesions, and painful skin infections while only being provided inadequate/inappropriate, and less efficacious medications, e.g., Permetherin Lotion, Ivermectin, Prednisone, antibiotics, and topical steroid medications.

20) At all relevant times, Plaintiff was suffering from a chronic and unstable serious skin disease at the times prior to, when, and after his Consultation Requests were denied by Defendant Centurion Utilization Management.

### *Failure to Provide Continuity of Access to a Specialist*

21) On October 14, 2019, after finally gaining approval, Plaintiff saw a specialist, Defendant Solano. Defendant Solano requested for medications for treatment

to be prescribed and for a follow-up appointment in one (1) month.

22)   On November 4, 2019, Plaintiff had a follow up appointment with Defendant Solano. Defendant Solano examined different areas of Plaintiff's skin, Plaintiff informed Defendant Solano that the medications he recommended to be prescribed, so far, were not beneficial in the treatment of his skin disease; it was recommended that Plaintiff continue taking Neurontin medication at a higher dosage level and requested to have a follow-up with him in three (3) months.

23)   Plaintiff did not have a follow up appointment with Defendant Solano in three (3) months as he had requested. February 4, 2020, would have been the target date for a three (3) month follow-up with the specialist (Defendant Solano).

24)   Sometime in February of 2020, Defendant Centurion implemented a policy due to the Covid-19 Pandemic which caused cancellations and/or caused delays of specialty clinic care appointments for inmates with medical conditions that were not life threatening.

25)   On or about March 30, 2020, Plaintiff went to Sick Call because of skin infections on the back of his head and upper-neck area that were causing him severe pain, the inability to lay his head down, and limited the mobility of his head. He was diagnosed with abscesses which caused deep skin scarring and loss of patches of hair.

26) On or about June 15, 2020, Plaintiff finally had a follow-up consultation with Defendant Solano (4 months later than when the consultation was supposed to be). It was determined that Plaintiff's skin was very thin and prone to easy injury and infections and that topical steroid medications were the cause. The specialist recommended that Plaintiff should no longer be prescribed Triamcinolone Acetonide Cream USP, 0.01% or other topical steroids for treatment. Defendant Solano informed Plaintiff that the symptoms he was showing were not symptoms of scabies infestation.

27) During the period of time Plaintiff awaited a follow-up appointment with the specialist, his skin disease continued in its progression and he continued to suffer rash-like bumps, intense itching, inflammation, excoriated lesions, wart-like bumps, painful skin infections, severe scarring of the skin, loss of hair, and difficulty sleeping even while he was using the medications prescribed (topical steroids and antibiotics).

### Denial of Adequate Medical Care
### Easier and Less Efficacious, Courses of Treatments
### Medical Negligence

28) After continuing inadequate and less efficacious medications for treatment of Plaintiff's skin disease during the preceding year, on December 4, 2020, Defendant Westfall saw Plaintiff for the first time. Plaintiff explained the history of his skin disease, how numerous care providers had diagnosed his

18

chronic and unstable serious skin disease as scabies infestation, and how all the medications and treatments that were prescribed in the past did not help provide him relief.

29) Defendant Westfall advised by stating, "[y]ou are at Putnam now and we have to do everything over because we haven't tried them here." He then prescribed Triamcinolone Acetonide Cream USP, 0.01%, Prednisone, and antibiotics, while having knowledge, via medical records and Plaintiff's verbal complaints that the medications failed to adequately treat or resolve his skin disease in the past.

30) On January 28, 2021, Plaintiff was diagnosed with skin infections located on his buttocks and leg that were causing him discomfort, severe pain, an inability to sit down properly, and difficulty walking; antibiotics were prescribed.

31) On February 2, 2021, Plaintiff was seen by Defendant Westfall. Plaintiff was informed that the skin scraping test performed on January 5, 2021, returned no evidence of scabies mites or larva.

32) On February 16, 2021, Defendant Westfall prescribed Plaintiff Ivermectin and Triamcinolone Acetonide Cream USP, 0.01% and advised him to continue taking the Prednisone medication as directed. Plaintiff complained that these medications proved ineffective in treatment in the past.

33) On or about February 17, 2021, Plaintiff submitted a Sick Call Request in regards to his diminishing eye sight.

34) On February 19, 2021, Plaintiff was diagnosed with scabies and was provided one tube of Permetherin Lotion as treatment for his skin disease. Plaintiff complained that this medication was not been beneficial in the past.

35) On February 23, 2021, Defendant Westfall informed Plaintiff of a treatment plan spanning approximately two weeks and insisted on prescribing Plaintiff Ivermectin and Permetherin Cream even after Defendant's complaints that these medications have been tried numerous times in the past and all failed to prevent the symptoms of his skin disease.

36) On March 8, 2021, Plaintiff had an appointment with an Optometrist. It was determined that Plaintiff was near sighted and would need prescription eye glasses.

37) On March 16, 2021, Plaintiff had a follow-up appointment with Defendant Westfall. Plaintiff showed Defendant Westfall that the symptoms of his skin disease persisted and Ketoconazole Cream and Fluconazole were prescribed. Plaintiff advised that those medications were not beneficial the previous time that they were prescribed to him for treatment.

38) Also, sometime between February and March 30, 2021, Defendant Westfall prescribed Plaintiff Clobetasol Propionate Ointment, USP 0.05%, another type

of topical steroid medication (high potency).

39)   At all relevant times, the visible symptoms of Plaintiff's skin disease did not resemble characteristics of scabies infestation, in that the visible symptoms did not show any raised red skin in a line (representing burrows) and possibly blisters or pustules, he did not have bumps or burrows between the fingers, on the elbow crease, armpit, groin crease, or behind the knees.

40)   At all relevant times, Defendant Westfall chose to ignore the obvious signs that the symptoms of Plaintiff's skin disease were symptoms of some other serious skin disease and then insisted to provide medical care that was grossly incompetent.

41)   Defendant Westfall conducted cursory examinations, failed to document all symptoms observed, and repeatedly prescribed medications that were known to be inadequate/inappropriate, easier and less efficacious courses of treatments and would not prevent substantial and irreparable harm.

42)   At all relevant times, Plaintiff was suffering from a chronic and unstable serious skin disease that was causing substantial and irreparable harm when Defendant Westfall insisted on prescribing Plaintiff medication for treatment while having knowledge that they were inadequate/inappropriate, easier and less efficacious courses of treatments.

43)   At all relevant times, Defendant Westfall also insisted on prescribing Plaintiff

topical steroid medications for treatment, while having knowledge of the recommendation made by a dermatologist on or about June 15, 2020, that Plaintiff should no longer be prescribed these types of medications because of the harm it has caused and the potential for further complications to his serious medical condition.

44) The prolonged use and overzealous prescribing of topical steroids, using as directed by numerous care providers, was the cause Plaintiff's thinned skin, made it prone to easy injury, infections, and is the cause of his diminished eyesight. The overzealous and prolonged use of topical steroid medications causes these types of adverse reactions and side effects. Plaintiff was also never evaluated periodically for evidence of HPA axis suppression after large doses of any potent topical steroid medication was prescribed.

45) While following all Defendant Westfall's prescribed treatment orders, Plaintiff's skin disease continued on in its progression, causing him to suffer intense itching, prickly or biting sensations, rash-like bumps, inflammation, wart-like lines, bumps, and thickened patches of skin, puss-filled blisters, atrophy, excoriated lesions, painful skin infections, severe scarring and disfigurement of the skin, loss of hair, difficulty sleeping, humiliation, severe depression, mental anguish, and the feeling of hopelessness.

22

### *Denial and /or Prolonged Delay in Providing Access to a Specialist*

46) On March 30, 2021, Plaintiff had a follow-up appointment with Defendant Westfall. Plaintiff complained that he was still suffering from the symptoms of his skin disease. Defendant Westfall stated to Plaintiff, "I am not a dermatologist. There is nothing more that I can do to treat your skin disease. I am going to refer you to a dermatologist." A Consultation Request was submitted to Defendant Centurion Utilization Management.

47) On May 3, 2021, Plaintiff submitted a Sick Call Request to access medical staff to inquire into the status of the Consultation Request. Later that same day, Plaintiff was seen by Nurse D. Richardson, who informed Plaintiff that his specialist appointment had not yet been approved.

48) On May 4, 2021, Plaintiff was called to the medical department and photographs were taken of different areas of his skin. Later that day, Plaintiff began receiving antibiotics [Doxycycline] without seeing a physician.

49) On May 21, 2021, Plaintiff was seen by Defendant Westfall. Plaintiff was informed that the Consultation Request for specialty care was not approved and that instead, an 'eConsult' was conducted through RubiconMD, which advised to "try oral antibiotics [Doxycycline] and see how he [Plaintiff] does and follow up in 3 months."

50) Plaintiff complained to Defendant Westfall that the eConsult–Rubicon MD

23

recommendation of prescribing Doxycycline for treatment was the same treatment that had already been prescribed multiple times in the past, and of no help in resolving his skin disease.

51) RubiconMD is an information service that does not provide medical diagnosis or treatment.

52) Defendant Westfall adhered to the treatment recommendation suggested through the 'eConsult' and continued the already prescribed Doxycycline for a total combined period of one month that began on the evening of May 6, 2021. Defendant Westfall informed that another Consultation Request [*third request*] would be submitted.

53) On June 5, 2021, Plaintiff completed the Doxycycline medication as prescribed. Plaintiff was not receiving any other medications. Plaintiff's skin disease remained unresolved.

54) On July 14, 2021, Plaintiff was scheduled an appointment with Nurse M. McAloose who asked Plaintiff to sign a [*fourth*] Consultation Request. Plaintiff asked Nurse M. McAloose what had happened to the [*third*] Consultation Request and Nurse M. McAloose stated, "I don't know."

55) Plaintiff finally gained access to a specialist via telehealth services on August 9, 2021.

56) While awaiting an appointment with a specialist Plaintiff's skin disease

24

continued on in its progression, causing him to suffer intense itching, prickly or biting sensations, rash-like bumps, inflammation, wart-like lines, bumps, and thickened patches of skin, puss-filled blisters, atrophy, excoriated lesions some were very large that caused constant burning sensations, painful skin infections, severe scarring and disfigurement of the skin, loss of hair, difficulty sleeping, humiliation, severe depression, mental anguish, and the feeling of hopelessness.

57) At all relevant times, Plaintiff was suffering from a chronic and unstable serious skin disease when Defendant Centurion Utilization Management denied and/or delayed him access to specialty medical care that was necessary to prevent substantial and irreparable harm.

### *Denial of Access to Medical Care*

58) On July 16, 2021, Plaintiff submitted a Sick Call Request to seek medical care for the treatment of uncontrollable intense itching, large excoriated lesions, painful skin infections, and burning sensations by placing the Sick Call Request in the designated secured box.

59) The Sick Call Request was not met with a response by medical staff; depriving Plaintiff of antibiotic ointments, soothing creams, bandages, etc.

60) On July 29, 2021, Plaintiff submitted a Sick Call Request to seek medical care for the treatment of uncontrollable intense itching, large excoriated lesions,

painful skin infections, and burning sensations by placing the Sick Call Request in the secured box.

61) The Sick Call Request was not met with a response by medical staff; depriving Plaintiff of antibiotic ointments, soothing creams, bandages, etc.

62) By FDC policy, the process to initiate requests for Sick Call Services will be available to inmates on a daily basis and Nursing Staff will review each Sick Call Request submitted to determine the urgency/seriousness of the inmates complaint and then assign a triage level. According to policy, a triage level "2" was warranted and required an appointment with nursing staff within 24 hours of receipt of the medical complaints Plaintiff made on his Sick Call Request.

63) Plaintiff's submittal of the Sick Call Request on July 29, 2021, was witnessed by former inmate Shawn Ashe, as he was directly behind Plaintiff in line when Plaintiff placed the Sick Call Request in the designated secured box. Shawn Ashe documented this in his General Affidavit.

64) Plaintiff had numerous encounters with the nursing staff since arriving at Putnam Correctional Institution. All medical staff at Putnam Correctional Institution was aware of Plaintiff's ongoing serious medical condition and his need for adequate medical treatment.

65) Plaintiff also submitted an institutional level Formal Grievance about not

being provided access to Sick Call via the Sick Call Request he submitted on July 29, 2021, and after the medical department reviewed his complaint, he still was not provided access to medical care through the Sick-Call process.

66) As a result of not being provided access to medical care via his Sick Call Requests, Plaintiff continued to suffer from intense itching, excoriated lesions, painful skin infections, and burning sensations, depression, mental anguish, and difficulty sleeping without any assistance from medical staff.

### *Inadequate Medical Care/Medical Malpractice*

67) On August 9, 2021, Plaintiff had a consultation with a specialist but it was not an in-person consultation, it was conducted via telehealth services. Defendant Solano relied on Plaintiff's memory exclusively to provide him a medical history. There was no review of medical records, only a cursory examination of two large lesions through a webcam was performed, and there was no diagnostic testing prior to diagnosis and recommendations for treatment being made.

68) As a cost saving measure, Defendant Centurion implemented and acted on a policy that permitted the use of telehealth services to provide specialty medical care to inmates.

69) The use of telehealth services deprived Plaintiff of a necessary and thorough physical examination and diagnostic testing, which were required in order to

obtain an accurate diagnosis and an appropriate treatment regimen.

70) Defendant Solano's patient evaluation and cursory examination through a webcam was insufficient to diagnose Plaintiff's skin disease or to make recommendations for treatment.

71) Plaintiff's skin disease is multifaceted, having many different types of easily visible skin bumps, inflammation, excoriated lesions, papules, blebs, vesicles, and puss-filled blisters.

72) Plaintiff's skin disease also has many not so easily seen symptoms that would not be visible through a webcam examination (but could be seen upon closer examination) such as soft wart-like lines, bumps, and thickened patches of skin, red thread-like linear lines, amongst many other symptoms.

73) Defendant Centurion and Defendant Solano's use of telehealth services to provide necessary specialty medical care for Plaintiff's serious medical condition that limited care to only an insufficient patient evaluation and a cursory examination through a webcam led to another misdiagnosis of Plaintiff's skin disease and the prescribing of inappropriate medications for treatment.

74) Defendant Centurion's policy that permitted the use of telehealth services to provide specialty medical care to Plaintiff and Defendant Solano's failure to practice in a manner consistent with his scope of practice and the prevailing

professional standard of practice for a health care professional who provides in-person health care services to patients in the State of Florida while using telehealth services is the direct cause of another misdiagnosis and inappropriate medications being prescribed.

75) Months after the telehealth services consultation with the specialist Plaintiff still suffers from intense itching, prickly or biting sensations, rash-like bumps, inflammation, wart-like lines, bumps, and thickened patches of skin, puss-filled blisters, atrophy, excoriated lesions, painful skin infections, severe scarring and disfigurement of the skin, loss of hair, difficulty sleeping, humiliation, severe depression, mental anguish, and the feeling of hopelessness.

### *Inadequate Medical Care*
### *Medical Malpractice/Medical Negligence*
### *Violation of Florida Administrative Law*

76) On September 17, 2021, Plaintiff learned that the medical director and licensed treating physician at Putnam Correctional Institution took a leave of absence due to a personal undisclosed medical issue. He was no longer available to provide oversight of the medical services being administered to inmates.

77) As there was no licensed physician available, the medical department was operating outside the framework of an established protocol maintained on-site.

29

Defendant Westfall had been the only employed licensed physician working in Putnam Correctional Institution's Medical Department to provide the oversight and supervision of the medical services being administered to patients by an advanced registered nurse practitioner.

78) After Defendant Westfall took his leave of absence, Defendant Dawson, ARNP, was the highest rated level of licensed employee of Defendant Centurion that provided medical care to patients at Putnam Correctional Institution.

79) As an Advanced Registered Nurse Practitioner Defendant Dawson is authorized to administer care in accordance with § 464.012(3),(4) Florida Statute.

80) On September 17, 2021, Plaintiff was seen by Defendant Dawson (ARNP), for the first time. Plaintiff's skin disease was not improved since his consultation with the specialist on August 9, 2021, his last appointment with Dr. Westfall on August 17, 2021, or since taking medication (Doxepin) as recommended by the specialist, which began on August 19, 2021. Plaintiff showed Defendant Dawson several irritated areas of his skin which had several excoriated lesions, painful infections, inflammation, rash-like bumps, wart-like bumps, and informed her that he is still intensely itchy and having difficulty sleeping.

81) Defendant Dawson advised that she was going to prescribe antibiotics (Doxycycline). Plaintiff then advised that Doxycycline had been prescribed numerous times in the past and that it was not beneficial in treating his many skin infections or to any of the other symptoms of his skin disease does not help improve his condition at all.

82) Plaintiff advised Defendant Dawson that he had been suffering from his skin disease for about four and one half (4½) years. Defendant Dawson responded by stating, "[y]eah, and you will likely have it until you leave here [meaning prison].

83) Plaintiff also advised that he was taking the Doxepin medication as recommended by the specialist for 4 weeks now and that it was not helping to improve his skin disease and that it was only causing him to have blurred vision and behavioral issues, e.g., confusion, irritability, and agitation. No adjustments or changes were made in regards to the medication (Doxepin).

84) Finally, Defendant Dawson stated, "Dr. Westfall has submitted a specialist consult request already." Plaintiff then informed her that it was for a follow-up with the specialist in February [2022] as the specialist had recommended but that he needed help now. Defendant Dawson then concluded the appointment by stating, "[W]e are done here."

85) Defendant Dawson made no referrals to advance Plaintiff's care to a licensed

physician or a specialist.

86) On October 1, 2021, Defendant Dawson responded to Plaintiff's medical related complaints that he submitted in an institutional Formal Grievance.

87) Defendant Dawson was not authorized to respond to an inmate's medical complaints stated in an institutional level Formal Grievance.

88) Defendant Dawson's response and signature on the Part B Response of an institutional level Formal Grievance of a medical nature was unauthorized and has deprived Plaintiff of a fair review by qualified medical personnel of the medical related complaints made in the Formal Grievance he submitted on September 17, 2021, which required, at a minimum, a response from a licensed physician; in violation of Chapter 33-103.008(1) of the Florida Administrative Code.

89) At the time Plaintiff submitted his institutional level Formal Grievance and when Defendant Dawson responded to it, Putnam Correctional Institution's medical department was not operating in compliance with Florida Law and the negotiated contract with FDOC.

90) At the relevant times, Plaintiff was suffering from a chronic and unstable serious skin disease prior to, when, and after Defendant Dawson responded, without authority to do so, to his medical related complaints made in an institutional level Formal Grievance.

32

91) On October 14, 2021, Plaintiff was seen by Defendant Dawson for a follow-up of his skin disease. The medical services being rendered to Plaintiff were still not within the framework of an established protocol maintained on site.

92) Plaintiff showed that he still had several excoriated lesions, painful infections, inflammation, rash-like bumps, wart-like bumps, and informed her that he is still intensely itchy and having difficulty sleeping.

93) Plaintiff again advised that the medication (Doxepin) he was prescribed was not helping to improve his condition and that it was only causing him blurred vision and behavioral issues. Plaintiff asked for his prescribed medication to be changed and was told that, "[y]ou have a follow-up consultation with the specialist scheduled. You can ask him to do that." Plaintiff asked for an earlier follow-up appointment with the specialist, as he was not currently scheduled for a follow-up until sometime in February 2022 (3+ months away).

94) Only Bacitracin Antibiotic Ointment was prescribed, an-over-the-counter type medication, which did not prevent Plaintiff's continued suffering from the symptoms of his skin disease.

95) No referral was made to advance Plaintiff's care to a licensed physician or a specialist and no follow-up appointment was scheduled.

96) At the relevant times, Defendant Dawson was well aware that Plaintiff required a level of care provided by a licensed physician and/or a specialist

33

and she knew that the she was not qualified or licensed to provide the level of medical care Plaintiff required.

97) Defendant Dawson knew that the medication Plaintiff was currently taking as recommended by the specialist, and the medications she prescribed to him (Doxycycline and Bacitacrin), were inadequate to provide him relief from the symptoms of his skin disease.

98) Defendant Dawson did not make the necessary referrals to advance Plaintiff's care to a licensed physician because there was not a licensed physician available at Putnam Correctional Institution.

99) Defendant Dawson actions were in an attempt to camouflage Defendant Centurion's failure to adequately staff the medical department at Putnam Correctional Institution.

100) Defendant Dawson's refusal to provide or advance Plaintiff's care to the level of care he required caused him to continue suffering intense itching, prickly or biting sensations, rash-like bumps, inflammation, wart-like lines, bumps, and thickened patches of skin, puss-filled blisters, atrophy, excoriated lesions, painful skin infections, severe scarring and disfigurement of the skin, loss of hair, difficulty sleeping, humiliation, severe depression, mental anguish, and the feeling of hopelessness.

***Inadequate Medical Care***
***Failure to Provide Continuity of Access to Specialist (Dermatologist)***
***Medical Care Provided by Unqualified Medical Personnel***
***Failure to Send Plaintiff to an Outside Facility***

101) On December 12, 2021, Plaintiff submitted a Sick Call Request because he had not had any follow-up appointment with a care provider since October 14, 2021, and because the medication (Doxepin) he was taking as prescribed was not helping to resolve, reduce, or manage the symptoms of his skin disease.

102) On December 28, 2021, Plaintiff was seen by Defendant Westfall and discussed the failure of his medication to prevent or manage the symptoms of his skin disease; after explanation of his appointments with only a nurse practitioner while he [Defendant Westfall] was on a leave of absence and the nurse practitioner's [Defendant Dawson] subsequent failure to refer Plaintiff to a physician or a specialist for care of his unstable chronic skin disease, Defendant Westfall advised that he was going to submit a Consultation Request and specifically request for the consultation with the specialist to be conducted in-person for physical examination and diagnostics.

103) On February 15, 2022, Plaintiff was transported to the Reception and Medical Center for his six (6) month follow-up appointment with a dermatologist. Plaintiff was seen by Defendant Gupta.

104) Defendant Gupta is a surgeon that specializes in general surgery; he does not specialize in dermatology, which is the specialty medical care Plaintiff

35

required.

105) Dr. Gupta rendered medical services to Plaintiff when he knew he was unqualified to exercise professional judgment over Plaintiff's chronic and unstable serious skin disease that was causing substantial and irreparable harm.

106) There was no review of medical records. There was no physical examination and no diagnostic tests were performed even after a physical examination and diagnostic tests were specifically requested by Plaintiff's primary care physician on December 28, 2021.

107) Defendant Gupta recommended medications (Claritan and Triamcinolone Acetonide Cream USP, 0.01%) to be prescribed. Plaintiff advised that those medications were of no help in reducing or limiting the symptoms of his disease in past treatment regimens.

108) Plaintiff later learned that the dermatologist he had seen on previous occasions was no longer providing medical services to inmate within the Florida Department of Corrections because he had resigned; no longer working under contract with Defendant Centurion.

109) Defendant Centurion failed to adequately staff the specialty care clinic at the Reception and Medical Center when Defendant Centurion Utilization Management scheduled and followed through with an appointment without

having qualified medical personnel specializing in dermatology available to exercise professional judgment over Plaintiff's serious chronic and unstable skin disease

110) Defendant Centurion had the resources available and could have sent Plaintiff to an outside facility to provide him the medical care he required, but chose not to do so.

111) Instead, Defendant Centurion sent Plaintiff to their Specialty Care Clinic at the Reception and Medical Center to be seen by medical personnel that was unqualified to exercise professional judgment over his serious medical condition just to be able to document that Plaintiff was seen by medical personnel for his follow-up dermatology appointment.

112) Defendant Centurion's refusal to provide Plaintiff access to an outside facility when they did not have qualified medical personnel specializing in dermatology available for his already scheduled follow-up appointment that was supposed to be conducted by a dermatologist was to save on the costs of Plaintiff's health care.

113) Defendant Centurion's refusal to provide the level of medical care Plaintiff required caused him to continue suffering intense itching, prickly or biting sensations, rash-like bumps, inflammation, wart-like lines, bumps, and thickened patches of skin, puss-filled blisters, atrophy, excoriated lesions,

37

painful skin infections, severe scarring and disfigurement of the skin, loss of hair, difficulty sleeping, humiliation, severe depression, mental anguish, and the feeling of hopelessness.

### Inadequate Medical Care
### Easier, and less efficacious, courses of treatments
### Prescribing Medication Known to be Harmful

114) On February 28, 2022, Plaintiff was seen in sick call for a blistery sore on his lip that was causing swelling, burning sensations, and was not healing. Plaintiff also had numerous bumps and ring-like swellings inside his mouth. Plaintiff was referred to the doctor.

115) During that same appointment, Plaintiff learned that Defendant Westfall documented that he saw Plaintiff on February 25, 2022, and that medications (Claritan and Triamcinolone Acetonide Cream USP, 0.01%) were prescribed. Plaintiff was never seen by Defendant Westfall on this day.

116) Defendant Westfall had knowledge, via Plaintiff's medical history, at the time he prescribed Claritan and Triamcinolone Acetonide Cream USP, 0.01% that they had already proved ineffective in numerous treatment regimens prescribed dating back as far as calendar year 2017.

117) Defendant Westfall also knew that Triamcinolone Acetonide Cream USP, 0.01% had also been overzealously prescribed to Plaintiff and that a specialist made a recommendation in June of 2020, for Plaintiff not to be prescribed this

type of medication.

118) Prolonged and overzealous use of topical steroid medications caused the thinning of his skin, (atrophy) which led to easy injury and skin infections; substantial and irreparable harm.

119) Defendant Westfall chose to ignore documented evidence and again prescribed Plaintiff a topical steroid medication for treatment while having knowledge of the complications it has already caused and the potential for further complications to his serious medical condition.

120) On March 4, 2022, Plaintiff was seen by Defendant Westfall for the blistery sore on his lip, and the numerous bumps, and ring-like swellings inside of his mouth. Defendant Westfall advised that he was going to prescribe antibiotics. When Plaintiff picked up his medication several days later it was not antibiotics; Fluconazole antifungal medication was prescribed for treatment.

121) Fluconazole was prescribed for treatment of Plaintiff's skin disease on two prior occasions. The most recent prescribing of this medication was ordered by Defendant Westfall on March 16, 2021, and was entirely ineffective.

122) Defendant Westfall knowingly prescribed a medication (Fluconazole) for treatment that does not prevent, manage, or resolve his skin disease and he similarly knew that this medication would not prevent Plaintiff's continued suffering and substantial and irreparable harm.

39

123) At all relevant times, Plaintiff was suffering from a chronic and unstable serious skin disease that was causing substantial and irreparable harm when Defendant Westfall insisted on prescribing Plaintiff medication for treatment while having knowledge that they were inadequate/inappropriate, less efficacious courses of treatments and would not prevent further substantial and irreparable harm.

124) At the time of filing this complaint, Plaintiff's chronic and unstable serious skin disease is still inaccurately diagnosed and inadequately medicated. Plaintiff's skin disease continues in its progression and is causing substantial and irreparable harm to Plaintiff.

## CLAIMS FOR RELIEF

125) The maintaining of policies, customs, directives, or practices by Defendant Centurion pursuant to which inmates with serious medical needs are routinely denied adequate medical care constitutes deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution.

126) The policies, customs, directives, or practices of Defendant Centurion which caused denials and/or the delay in providing Plaintiff access to a specialist after it was determined to be necessary for treatment of a chronic and unstable

40

serious skin disease that was causing substantial and irreparable harm constitutes deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution.

127) The policies, customs, directives, or practices of Defendant Centurion which deprived Plaintiff continuity of access to qualified medical personnel specializing in dermatology for care of a chronic and unstable serious skin disease that was causing substantial and irreparable harm constitutes deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution.

128) Defendant Westfall's actions of knowingly prescribing medications to Plaintiff that were inappropriate/inadequate, easier, and less efficacious courses of treatments for a chronic and unstable serious skin disease that was causing substantial and irreparable harm constitutes inadequate medical care and was in deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution.

129) Defendant Westfall's actions of ignoring and failing to accurately document all the symptoms of Plaintiff's skin disease that was causing substantial and irreparable harm constitutes inadequate medical care and was in deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution.

130) Defendant Westfall's actions of knowingly making inaccurate diagnoses and prescribing of medications that were inappropriate/inadequate, easier, and less efficacious courses of treatments for a chronic and unstable serious skin disease that would not prevent substantial and irreparable harm constitutes medical negligence in violation of § 766.106 of the Florida Statutes.

131) Defendant Westfall's actions of prescribing topical steroid medications to Plaintiff which he knew or should have known to be inappropriate, harmful, that they caused injury, and that if continued they would cause Plaintiff further substantial and irreparable harm constitutes inadequate medical care and was in deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution

132) Defendant Westfall's actions of prescribing topical steroid medications to Plaintiff which he knew or should have known to be inappropriate, harmful, that they caused injury, and that if continued they would cause Plaintiff further substantial and irreparable harm constitutes medical negligence in violation of § 766.106 of the Florida Statutes.

133) Jane Doe #1 and Jane Doe #2 actions of denying Plaintiff access to medical care, via the Sick Call Requests he submitted on July 16, 2022, and July 29, 2022, for care of a chronic and unstable serious skin disease that was causing substantial and irreparable harm constitutes deliberate indifference to

Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution.

134) The policy, directive, or practice of Defendant Centurion which allowed the use of telehealth services to provide Plaintiff specialty medical care for a chronic and unstable serious skin disease requiring a physical examination and diagnostic testing to prevent substantial and irreparable harm      constitutes deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution

135) Defendant Solano's utilization of telehealth services to provide Plaintiff specialty medical care for a chronic and unstable serious skin disease that was causing substantial and irreparable harm was insufficient and constitutes medical negligence in violation of § 766.106 and § 456.47 of the Florida Statutes.

136) Defendant Dawson's actions of ignoring complaints and the obvious signs of the ineffectiveness of a prescribed medication for the treatment of Plaintiff's chronic and unstable serious skin disease that was causing substantial and irreparable harm constitutes deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution.

137) Defendant Dawson's actions of refusing to make necessary referrals to qualified medical personnel capable of exercising professional medical

judgment over Plaintiff's chronic and unstable serious skin disease that was causing substantial and irreparable harm constitutes inadequate medical care and was in deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution

138) Defendant Dawson's actions of refusing to make necessary referrals to qualified medical personnel capable of exercising professional medical judgment over Plaintiff's chronic and unstable serious skin disease that was causing substantial and irreparable harm constitutes medical negligence in violation of § 766.106 and § 464.012(3),(4) of the Florida Statutes.

139) Defendant Centurion's failure to adequately staff Putnam Correctional Institution's Medical Department caused medical services to be administered to Plaintiff by an Advanced Registered Nurse Practitioner outside the framework of an established protocol constitutes medical malpractice in violation of § 766.106; § 458.348(1)(a); § 464.012(3),(4) of the Florida Statutes.

140) Defendant Dawson's action of responding to Plaintiff's medical related complaints he made in an institutional level Formal Grievance, which required, at a minimum, a response provided by a licensed physician constitutes medical malpractice in violation of § 766.102; § 464.012(3),(4) of the Florida Statutes; and Ch. 33-103.008(1) F.A.C.

44

141) Defendant Centurion's failure to adequately staff the specialty clinic at the Reception and Medical Center caused medical services to be administered to Plaintiff by unqualified medical personnel for the treatment of a chronic and unstable serious skin disease that was causing substantial and irreparable harm constitutes deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution.

142) Defendant Centurion's failure to send Plaintiff to an outside facility to obtain the specialty medical services that he required for the treatment of a chronic and unstable serious skin disease that was causing substantial and irreparable harm when qualified medical personnel specializing in dermatology were not available at the Reception and Medical Center constitutes deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution.

143) Defendant Gupta's rendering of medical services to Plaintiff when he knew he was unqualified for because Plaintiff required care from medical personnel specializing in dermatology for treatment of a chronic and unstable serious skin disease that was causing substantial and irreparable harm constitutes deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment of the U.S. Constitution.

144) Defendant Westfall's action of prescribing Plaintiff medications and erroneously documenting that he saw Plaintiff on February 25, 2022, constitutes medical malpractice/medical negligence in violation of § 456.0635; § 766.102 of the Florida Statutes.

## V. Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

A.  As a result of not receiving adequate medical care over the course of approximately 5 years, Plaintiff's symptoms continued in their intensity and frequency, spreading to every area of his body, including inside of his mouth. Plaintiff has continuously suffered discomfort, intense itching, prickly or biting sensations, rash-like bumps, inflammation, wart-like lines, bumps, and thickened patches of skin, puss-filled blisters, atrophy, excoriated lesions (some large excoriated lesions that cause a continuous burning sensation), painful skin infections, bumps and ring-like swellings inside his mouth, severe scarring and disfigurement of the skin, loss of hair.

B.  Plaintiff's skin has been severely damaged and has numerous deep tissue scarring from head to toe, including his face.

C.  Plaintiff had much difficulty sleeping during the night as that is the time when his symptoms of intense itching were noticed and felt the most.

D.  The above-listed symptoms were also causing Plaintiff to suffer, depression, mental anguish, humiliation, and caused him to feel hopeless

and isolated from other inmates, as most stayed away from him due to his appearance and their firm belief that Plaintiff was contagious.

E.  Plaintiff was forced to wear uncomfortable clothing such as long sleeve shirts and long pants during hot summer months with no air conditioning in housing units in order to conceal the symptoms of his skin disease.

F.  Often times, Plaintiff's recreation activities became limited due to the swelling, soreness, and pain from major skin infections.

G.  Plaintiff was unable at times to be groomed in a barber shop because of an FDC policy that restricts inmates with excoriated lesions and infections on their scalp to be groomed.

## VI.  Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

A.  Issue a declaratory statement stating that:

1.  Defendant Centurion's policies, customs, directives, or practices were the causation of inadequate medical care for Plaintiff's medical needs.

2.  The policies, customs, directives, or practices were the causation of the denials of Consultation Requests and/or delays in providing Plaintiff access to a specialist in dermatology for necessary medical care at a level required for treatment of his serious medical condition.

3.  The policies, customs, directives, or practices were the causation of Plaintiff's suffering, and substantial and irreparable bodily harm.

4.  The implementation or use of the policies, customs, directives, or practices violated Plaintiff's civil rights under the Eighth Amendment to

the United States Constitution.

B. Issue an Injunction ordering Defendant Centurion to:

1. Provide Plaintiff access to a specialist in dermatology for an in-person consultations so that a physical examinations can be conducted and so diagnostic tests may be performed as needed so that an accurate diagnosis can be achieved;

2. Ensure Plaintiff continuity of adequate medical care provided by a specialist in dermatology until the symptoms of his skin disease are cured, contained, managed.

3. Adhere to any recommendations for treatment promulgated by a specialist and prescribe medication without delay and without interruption.

C. Award compensatory damages in the following amounts:

1. $400,000 jointly and severally against Defendant's Jackie Westfall, Loretta Dawson, Max Solano, Anand A. Gupta, Jane Doe #1, and Jane Doe #2 for the physical and emotional injuries Plaintiff sustained as a result of their negligent acts and failure in providing him adequate medical care for a serious medical condition.

D. Award punitive damages in the following amounts:

1. $50,000 each against Defendant's Jackie Westfall, Loretta Dawson, Max Solano, Anand A. Gupta, Jane Doe #1, Jane Doe #2.

F. Grant such other relief as it may appear that Plaintiff is entitled.

## VII Exhaustion of Administrative Remedies Administrative Procedures

E. If you did file a grievance:

1. Where did you file the grievance?

   Various Institutions–Taylor CI; SFRC; RMC; Madison CI; Putnam CI.

2. What did you claim in your grievance?

   a. Continued prescribing of medication that proved ineffective.

   b. Continued prescribing of medication that proved ineffective.

   c. Failure to provide adequate medical care.

   d. Refusal to provide access to medical specialist.

   e. Denial of access to a medical specialist.

   f. Prolonged delay in access to a specialist.

   g. Emergency Grievance – Prolonged delay in access to a specialist.

   h. Denial of access to medical care via sick call request.

   i. Failure to provide adequate medical care during specialist consultation.

   j. Specialist was negligent in making his recommendation for treatment.

   k. Failure to provide adequate medical care during appointment with care provider.

   l. Refusal to provide photocopies of requested medical documents within 10 business days of the request.

   m. Failure to provide continuity of access to qualified medical personnel specializing in dermatology.

   n. Inadequate medical care for prescribing of medications that are known to be ineffective and for erroneously documenting that Dr. Westfall saw Plaintiff on February 25, 2022.

   o. Inadequate medical care for prescribing medication that are known to be ineffective.

3. What was the result, if any?

   a. Denied

   b. Denied

   c. Denied

   d. Denied

e.  Approved

f.  Approved

g.  Denied

h.  Denied

i.  Denied

j.  Returned without action

k.  Returned without action

l.  Approved

m. Denied

n.  Answer Pending

o.  Answer Pending